# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LARRY EDWARD HATFIELD,<br><br>    Plaintiff,<br><br>v.<br><br>JEFFERSON B. SESSIONS, III, *in his Official Capacity as the Attorney General of the United States*,<br><br>    Defendant. | Case No. 3:16-cv-00383-JPG-RJD |

## MEMORANDUM & ORDER

## J. PHIL GILBERT, DISTRICT JUDGE

    Plaintiff Larry Edward Hatfield wants to keep a gun in his home for self-defense. But the Government bans him from doing so, because 28 years ago, Hatfield lied on some forms that he sent to the Railroad Retirement Board: a felony in violation of 18 U.S.C. § 1001(a). Hatfield later pled guilty to one count of violating the statute, an offense for which he received no prison time and a meager amount in restitution fees pursuant to a formal plea agreement with the Government. Now, Hatfield brings this as-applied challenge to 18 U.S.C. § 922(g)(1)—the statute that bans him from owning a gun—on the grounds that it violates his Second Amendment rights. Hatfield embeds his argument in *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010), which instructed that "[the Supreme Court's decision in *D.C. v. Heller*, 554 U.S. 570 (2008)] referred to felon disarmament bans only as 'presumptively lawful,' which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge." If there is any case that rebuts that presumption, it is this one. So for the following reasons, the Court **GRANTS** summary judgment in favor of Plaintiff Larry E. Hatfield.

1

I.  **BACKGROUND**

The facts of this case are undisputed. From August 5, 1989 to January 5, 1990, Hatfield completed several claim for benefits forms and sent them to the U.S. Railroad Retirement Board. (Def.'s Mot. Summ. J., Ex. A, ECF No. 41-1.) That agency administers benefits for unemployed railroad workers pursuant to the Railroad Unemployment Insurance Act. 45 U.S.C. § 351, *et seq.* (*Id.*) But Hatfield lied on the forms: he claimed that he was unemployed for 53 days when he was actually working for the Merchant Management Corporation of St. Louis, Missouri. Hatfield wrongfully obtained $1,627.73 from the Railroad Retirement Board because of the lie. (*Id.*) Shortly thereafter, the Government charged Hatfield with one count of making a false statement in violation of 18 U.S.C. § 1001(a): a felony.

Hatfield later pled guilty to the charge following formal plea negotiations with the Government. Even though 18 U.S.C. § 1001(a) provides for up to five-years imprisonment for each violation, the Government recommended in the amended plea agreement that the court only sentence Hatfield to three years' probation plus restitution in the amount of improper benefits received: $1,627.73. The court agreed, and ultimately sentenced Hatfield to those terms. (*See United States v. Hatfield*, No. 3:91-cr-30093.) Since that time, Hatfield has maintained a spotless record: he has no mental health issues, he does not drink, he has no drug addictions, and he does not even have any traffic citations since his felony conviction. The only other blight in his history is a driving while intoxicated charge from the 1980s, which predates the felony charge. (Hatfield Dep. 31:24–32:13, ECF No. 41-5.)

Fast forward nearly three decades and we have a problem. Even though Hatfield received a small fine and no prison time for his non-violent statutory felony, 18 U.S.C. § 922(g)(1) bans him from owning a gun. That statute makes it unlawful for a person to possess a gun if they have

been convicted of a crime that is technically punishable by more than one year (i.e. a felony)—regardless of the sentence that the individual actually received. Since making a false statement in violation of 18 U.S.C. § 1001(a) is punishable by up to five years, Hatfield falls within the gambit of § 922(g)(1).

Hatfield now brings an as-applied challenge to the statute, arguing that it violates his Second Amendment rights. His theory is straightforward: the Seventh Circuit has said that "there must exist the possibility that the [felon disarmament] ban could be unconstitutional in the face of an as applied challenge," *Williams*, 616 F.3d at 692, and Hatfield believes that he is the perfect challenger. He argues that the Government does not have an important interest in banning non-violent felons who received no prison time like him from having a gun. Hatfield also points out that while every state he researched has some sort of process to restore Second Amendment rights to felons on a case-by-case basis, the federal government does not. Curiously, 18 U.S.C. § 925(c) does provide a similar mechanism for a federal felon to restore their Second Amendment rights through an application to the Attorney General, but Congress has chosen to not fund § 925(c) since the early 1900s. Accordingly, the only other ways for a felon affected by § 922(g)(1) to restore his gun rights are (1) through a Presidential pardon, or (2) an expungement of the felony.

The Government moved for summary judgment, arguing that (1) the Second Amendment does not protect felons; and (2) even if it does, § 922(g)(1) satisfies intermediate scrutiny as-applied to felons like Hatfield. (Def.'s Mot. Summ. J., ECF No. 41-2.) The Court held oral argument on the matter, where Hatfield made a cross-motion for summary judgment for the reasons stated within his response brief. (*See* Pl.'s Resp. to Def.'s Mot. Summ. J., ECF No. 47.)

II.     **LEGAL STANDARDS**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

## III. ANALYSIS

The Second Amendment commands: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." Second Amendment rights, however, are not dependent on militia service: the amendment chiefly protects "the right to keep and bear arms for the purpose of self-defense." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 750 (2010) (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008)). *Heller* explained that while the militia clause announced one purpose of the amendment's codification—to prevent the new federal government from disarming and oppressing the People, much like the English tried to do to the American Colonies—it had little to do with the central component of the "ancient right" to bear arms itself, which includes primary purposes like "self-defense and hunting." *Heller*, 554 U.S. at 599.

*Heller* gave birth to this case through a much-discussed footnote in the opinion. First, *Heller* instructs that nothing in the opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Heller*, 554 U.S. at 626–27. But then, a footnote attached to that same paragraph reads: "We identify these **presumptively lawful**

4

regulatory measures only as examples; our list does not purport to be exhaustive." *Id*. at 627 n.26 (emphasis added). The Seventh Circuit has already noted this dichotomy:

> But the government does not get a free pass simply because Congress has established a "categorical ban"; it still must prove that the ban is constitutional, a mandate that flows from *Heller* itself. *Heller* referred to felon disarmament bans only as "presumptively lawful," which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge. Therefore, putting the government through its paces in proving the constitutionality of § 922(g)(1) is only proper.

*United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (internal citation omitted).

The Seventh Circuit has since adopted a two-step inquiry for Second Amendment claims: (1) does the challenged statute cover conduct that falls within the Second Amendment's protections; and (2) if so, does the statute survive "some level of heightened scrutiny"? *Baer v. Lynch*, 636 F. App'x 695, 698 (7th Cir. 2016). The case law applying this test, however, is messy. Some cases refuse to analyze step one and immediately jump to step two. *Id.*; *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (*en banc*);[1] *Williams*, 616 F.3d 685; *Horsley v. Trame*, 808 F.3d 1126 (7th Cir. 2015). One case blends the two steps together. *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010). Another case jumps the ship and asks if the challenged regulation has "some reasonable relationship to the preservation or efficiency of a well regulated militia," a test which contradicts *Heller* itself. *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 410 (7th Cir. 2015). There is only one case—*Ezell v. City of Chicago*, 651 F.3d 684, 700–04 (7th Cir. 2011)—that engages in a thorough analysis of both steps.[2]

---

[1] Judge Sykes, dissenting, stated that the *Skoien* majority "declines to be explicit about its decision method, sends doctrinal signals that confuse rather than clarify, and develops its own record to support the government's application of § 922(g)(9) . . . ." 614 F.3d at 647 (Sykes, J., dissenting).
[2] Judge Sykes wrote the majority opinion in *Ezell*—one year after her dissent in *Skoien*.

5

Despite this entanglement, it is possible to boil down the relevant case law to two steps. First, does the Second Amendment protect felons in the same class as Hatfield? Second, if the Second Amendment does protect felons like Hatfield, does § 922(g)(1) survive "some level of heightened scrutiny"?

### A. Step One: The Second Amendment and Felons

The Second Amendment protects the "right of the people" to bear arms. The question at step one is simple: is Hatfield one of "the people" shielded by the amendment? Does the amendment protect all adult people in the United States? "The people" minus all felons? "The people" minus violent felons? Some other subset of "the people"?

The answer, unfortunately, is not so simple. In 2016, the Seventh Circuit stated:

> We have not decided if felons historically were outside the scope of the Second Amendment's protection and instead have focused on whether § 922(g)(1) survives intermediate scrutiny. *Williams*, 616 F.3d at 692; *see also United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (noting that "scholars continue to debate the evidence of historical precedent for prohibiting criminals from carrying arms").

*Baer*, 636 F. App'x at 698. *Baer* sums up the pattern in Seventh Circuit cases: avoid answering step one instead jump ahead to step two—the intermediate scrutiny analysis—because the challengers in those cases resoundingly failed there anyways. *See, e.g., Baer,* 636 F. App'x 695 (a convicted robber failing at the intermediate scrutiny stage); *Williams*, 616 F.3d at 693–94 (another convicted robber failing at the intermediate scrutiny stage); *Skoien*, 614 F.3d at 641–45 (a plaintiff with two convictions for misdemeanor crimes of domestic violence failing at the intermediate scrutiny stage of a § 922(g)(9) challenge); *Horsley*, 808 F.3d at 1131 ("We need not decide today whether 18–, 19–, and 20–year–olds are within the scope of the Second

Amendment . . . [e]ven if they are, our next step would be to turn to means-ends scrutiny of the regulation.") (internal citation omitted).

*Ezell*, 651 F.3d 684, is the only case to apply a strong framework to step one. This Court will follow *Ezell*'s lead. That case dealt with a challenge to a Chicago ordinance that banned firing-ranges in the city, but also mandated those applying for gun licenses to have firing-range training—effectively banning many people from obtaining gun licenses. *Id.* at 690–92. Accordingly, the question at step one was whether "range training is categorically unprotected by the Second Amendment." *Id.* at 704. The *Ezell* court centered the burden of persuasion on this question on the government:

> Accordingly, if the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment—1791 or 1868—then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review. If the government cannot establish this—if the historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected—then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights.

*Id.* at 702–03. So applying the *Ezell* framework to this case, the Government must prove at step one that nonviolent felons like Hatfield are categorically unprotected by the Second Amendment.

*Heller* is the first place to start when analyzing this question. Justice Scalia, writing for the majority, broke the amendment into several clauses—one of which was "Right of the People." *Heller*, 554 U.S. 579–80. This term of art appeared in three amendments: The First Amendment's Assembly-and-Petition Clause, the Second Amendment, and the Fourth Amendment's Search-and-Seizure Clause. *Id. Heller* explained that given the context of these amendments, the Second Amendment must necessarily protect an individually held right—just

7

like the First and Fourth Amendments—rather than some sort of collective right that requires participation in a group. And although "right of the people" appears in three other provisions of the Constitution—the preamble ("We the people"), Article I, and the Tenth Amendment—Heller placed those provisions in a separate category because they dealt with the exercise or reservation of powers—not individual rights. *Id.* at 580–81.

Next, Heller noted that in all of the above mentioned provisions of the Constitution, "the people" refers "unambiguously to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580.

> '[T]he people' seems to have been a term of art employed in select parts of the Constitution . . . [Its uses] sugges[t] that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

*Id.* (quoting *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)). Accordingly, *Heller* announced a "strong presumption that the Second Amendment right is exercised individually and **belongs to all Americans**." *Id.* at 581 (emphasis added). That view comports with the predecessor to the Second Amendment: the 1689 English Declaration of Rights. The declaration states: "[t]hat the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." *Id.* at 592. *Heller* clarified that even though these rights were limited to Protestants, "it was secured to them as individuals, according to 'libertarian political principles,' not as members of a fighting force." *Heller*, 554 U.S. at 593. To summarize, if the Supreme Court has announced that there is a presumption that Second Amendment rights belong to all Americans—a category which would include felons—then this Court is bound to follow that presumption, unless the Government can rebut it.

The Government has pointed to several authorities in an attempt to carry their burden. One of these authorities is "The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787," which *Heller* identified as a "highly influential" precursor to the Second Amendment. *Heller*, 554 U.S. 570 at 604; *Skoien*, 614 at 640. It states that "the people have a right to bear arms for the defense of themselves and their own State, or the United States, or for the purpose of killing game; **and no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals** . . . ." *Id.* (emphasis added). The Government also points to *Yancey*, which explained that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" 621 F.3d at 684–85. That ties into another case—*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001)—which explained that scholarly sources on this issue indicate that "Colonial and English societies of the eighteenth century . . . excluded . . . felons [from possessing firearms]" and "the Founders [did not] consider[] felons within the common law right to arms or intend[] to confer any such right upon them." 270 F.3d at 226 n.21.

The Government has fallen on their own sword by relying on these cases: at the time of the founding, English common-law felonies consisted of murder, rape, manslaughter, robbery, sodomy, larceny, arson, mayhem, and burglary. *Jerome v. United States*, 318 U.S. 101, 108 n.6 (1943); Wayne R. LaFave, Criminal Law, § 2.1(b) (5th ed. 2010). So if the Founders intended to allow Congress to disarm unvirtuous felons, that intent would have necessarily been limited to individuals convicted of one of those nine felonies. Hatfield, however, violated a statutory felony that Congress created in 1948: making a false statement in breach of 18 U.S.C. § 1001. That offense is most similar to the common law offense of forgery, which first arose in 1727 as a

9

*misdemeanor*—not a felony. *Jerome*, 318 U.S. at 109 n.7; LaFave, *supra*.[3] Critics of this approach may complain that we do not read constitutional rights this way—for example, the Fourth Amendment prohibition against unreasonable searches now applies to electronic devices that the Founders did not contemplate, and the First Amendment covers forms of communication that the Founders did not contemplate. But those scenarios are entirely different: they consider the *expansion* of constitutional rights that protect the people over time, whereas the Government here is attempting to *shrink* Second Amendment rights of the people.

And on a similar note, if the Court accepts the Government's position, it would lead to a harebrained outcome in which the Founders meant to allow Congress to inadvertently disarm the people by passing gobs of statutory felonies not contemplated at the common law, such as making a false statement (18 U.S.C. § 1001(a)); depositing merchandise in a building upon the boundary line between the United States and any foreign country (18 U.S.C. § 547); operating or holding any interest in a gambling establishment on a ship (18 U.S.C. § 1082); transporting lottery tickets across state lines when one state forbids lottery tickets (18 U.S.C. § 1301); mailing indecent matter on the outside of an envelope (18 U.S.C § 1463); possessing contraband smokeless tobacco (18 U.S.C. § 2342(a)); defacing any marks or numbers placed upon packages in a warehouse (18 U.S.C § 548); and more.

Even if the Founders did intend for such a result, the Government has certainly not carried their burden and established as much: they dedicate a mere two paragraphs of their motion for summary judgment to the historical record and have introduced zero evidence to actually develop that record. (Def.'s Mot. Summ. J. 14–15, ECF No. 41-1.) And even if the Court views the available historical record in the light most favorable to the Government, that

---

[3] "The essential elements of the common law crime of forgery are (1) a false making of some instrument in writing; (2) a fraudulent intent; [and] (3) an instrument apparently capable of effecting a fraud." *Vizcarra-Ayala v. Mukasey*, 514 F.3d 870, 874 (9th Cir. 2008) (internal citation omitted).

record is inconclusive—meaning the Government has failed at step one. *See Skoien,* 614 F.3d at 647 (Sykes, dissenting) ("the historical evidence [on whether the Second Amendment protected felons] is inconclusive at best."); *Yancey*, 621 F.3d at 684–85 (comparing academic sources on the matter); *Ezell*, 651 F.3d at 702–03 ("if the historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected—then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights.").

> **B.     Step Two: "Second Amendment Scrutiny"**

The next step is to determine whether § 922(g)(1) survives some form of heightened scrutiny as-applied to nonviolent felons like Hatfield. The Seventh Circuit has not been clear on which level of scrutiny to apply. *Skoien* points to intermediate scrutiny: the statute "is valid only if substantially related to an important governmental objective." *Skoien*, 614 F.3d at 641. *Williams* also instructs that intermediate scrutiny should apply. 616 F.3d at 692. But *Ezell*—which postdates both *Skoein* and *Williams*—complicated the matter:

> First, a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right.

*Ezell*, 651 F.3d at 708. *Ezell* explained that intermediate scrutiny was appropriate in *Skoien* because that case did not involve the central self-defense component of the Second Amendment. *Id*. That distinguishes *Skoien* from this case: Hatfield wants to keep and bear arms in his home for self-defense. (Compl. ¶ 11, ECF No. 1.) Nevertheless, the Government asks the Court to apply intermediate scrutiny. (Def.'s Mot. Summ. J. 13, ECF No. 41-1.)

The Court, however, must apply an *Ezell* analysis. That case postdates and distinguishes itself from *Skoien*, and if the Court ignores it, then the Court would be in breach of its duty to follow Seventh Circuit precedent. Accordingly, the Government here must show (1) an extremely strong public-interest justification for banning non-violent felons who received no prison time from possessing firearms for self-defense purposes; and (2) a close fit between that purpose and § 922(g)(1). *Ezell*, 651 F.3d at 708. This standard is murky: it is higher than intermediate scrutiny—which only requires an important government interest that is substantially related to the challenged statute—but it is necessarily lower than strict scrutiny, which requires a compelling government interest and a statute that is narrowly tailored to meet that interest. *See Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2231, 192 L. Ed. 2d 236 (2015) (explaining strict scrutiny).

        *i.*      *Purpose: an "extremely strong" public interest justification*

The Government's argument here is simple: they have an "obviously important" interest in curbing crime by keeping firearms from criminals. *See Barrett v. United States*, 423 U.S. 212, 218 (1976) (the principal objective of § 922(g)(1) is "to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous."); *Small v. United States*, 544 U.S. 385, 393 (2005) (§ 922(g)(1) "keep[s] guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society."); *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017) ("Where the sovereign has labeled the crime a felony, it represents the sovereign's determination that the crime reflects grave misjudgment and maladjustment.") The Government believes that the distinction between violent and non-violent offenders is irrelevant here because "irrespective of whether the offense was violent in nature . . . a felon has shown manifest disregard for the rights of others." *United*

*States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004). Hatfield objects, arguing that since this is an as-applied challenge, the Government must focus on Hatfield's individual circumstances rather than felons—violent or not—in the aggregate.

Both parties have erred. As an initial matter, the Government is correct that they do not have to focus on Hatfield's specific circumstances: when combating as-applied challenges, the Court focuses "on the relation [the statute] bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989); *see also United States v. Edge Broad. Co.,* 509 U.S. 418, 431 (1993). But here, the Government has characterized the "problem" far too broadly. If the Court only considers felons in the aggregate, then there would be no distinction between an as-applied challenge to § 922(g)(1) and a facial challenge. And even if the Court narrows the scope to non-violent felons, it is still not enough—there are scores of non-violent felons in this country, all with massive discrepancies in prison sentences, fines, restitution payments, and more. Accordingly, the Court holds that the "class" of as-applied challengers here should be more specific to Hatfield's general circumstances: non-violent felons who received no prison time and a small monetary fine for their offense. That distinguishes this case from a recently failed § 922(g)(1) challenge in the Eastern District of Wisconsin, where the challenger had received twelve months and one day in jail plus a $50,000 fine. *See Kanter v. Sessions*, No. 16-C-1121, 2017 WL 6731496, at *1 (E.D. Wis. Dec. 29, 2017).

With that principle in mind, the Government has failed to show an "extremely strong public-interest justification" for banning non-violent felons who received no prison time from owning a gun for self-defense purposes. Rather, Hatfield is correct that the Government has engaged in an "abdication of their obligations" here: the Government—instead of focusing on a

narrow class of as-applied challengers—rests their position on the broad idea that since felons have shown a "manifest disregard for the rights of others," the Government may immediately strip them of their Second Amendment rights. The Government seems to think this is the case even if they cut a plea deal with the felon that recommended zero days in prison, like they did with Hatfield. It is absolutely impossible to reconcile the Government's positions here that (1) a specific felon is so harmless that the felon does not need to go to prison for their felony conviction, but also (2) the felon is so dangerous that they should be stripped of their right to own a gun and defend their home. This type of logical inconsistency shows that the Government is not taking the Second Amendment seriously. The Second Amendment *has to mean something* as a matter of law, policy debates aside. Overbroad policies ignoring a constitutional amendment are inexcusable.

### ii. *The fit between the Government's purpose and § 922(g)(1)*

Even if the Government demonstrated an extremely strong public interest justification, they nevertheless fail at the next requirement: a close fit between their purpose and § 922(g)(1). The Government's arguments on purpose and fit blend together: they rely on the same cases that explain § 922(g)(1) keeps guns away from those Congress has labeled as irresponsible and dangerous. *See*, *e.g.*, *Barrett,* 423 U.S. at 218; *Small*, 544 U.S.at 393; *Hamilton*, 848 F.3d at 626. The Government also commands that the Court should award Congress "substantial deference" here because Congress is "better equipped than the judiciary to make predictive judgments . . . upon complex and dynamic issues." *Turner Broad. Sys. Inc. v. FCC*, 520 U.S. 180, 195 (1997); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 210, n.21 (5th Cir. 2012); (Def.'s Mot. Summ. J. 18, ECF No. 41-1.)

The history of § 922(g)(1) highlights the irrationality of the Government's position. The Federal Firearms Act of 1938—the first major piece of federal legislation on this matter—only banned those "convicted of a crime of violence" from owning guns. PL 75-785, June 30, 1938, 52 Stat. 1250. That legislation did not reach non-violent offenders, like Hatfield. In 1961, Congress amended the statute to substitute "crime punishable by imprisonment for a term exceeding one year" for "crime of violence"—meaning the statute now reached all felons, regardless of their underlying crime. *United States v. Weatherford*, 471 F.2d 47, 51–52 (7th Cir. 1972). The Senate Report indicates that the purpose of the amendment was to "make it more difficult for the criminal elements of our society to obtain firearms." *Id.*

The caveat: six years later, Congress passed the Omnibus Crime Control and Safe Streets Act of 1968. That Act cemented § 922(g)(1) into its current form. But the Act also crafted something else: 18 U.S.C. § 925(c), a relief valve for felons impacted by § 922(g)(1) to restore their firearm rights by application to the Attorney General. Specifically, if the Attorney General (through the Bureau of Alcohol, Tobacco, Firearms, and Explosives [ATF]) determines that a felon is not "likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest," then the Attorney General may restore the felon's firearm rights. The statute also provides for judicial review of the Attorney General's decision. § 925(c) is a tacit admission by Congress that § 922(g)(1) is overbroad by facially applying to all felons regardless of their underlying crime or circumstances—indicating a bad fit between § 922(g)(1) and the Government's purpose of keeping firearms out of the hands of dangerous criminals who may create armed mayhem.

If the Government argued here that § 925(c) is a relief valve that saves § 922(g)(1)'s poor fit, then they could have won this case. But the Government was foreclosed from bringing that

argument because *Congress stopped funding* § 925(c) in 1992—transforming what should have been a simple administrative proceeding into constitutional litigation. *See* PL 102–393, October 6, 1992, 106 Stat. 1729; *United States v. Bean*, 537 U.S. 71, 74 (2002). For example, in *Bean*, the challenger applied to ATF for a restoration of his firearm rights pursuant to § 925(c). *Id.* at 73. ATF, however, was forced to return the application and explained that the appropriations laws prevented the Bureau from expending funds on § 925(c) applications. The challenger then filed suit in federal court, relying on the judicial review provision in the statute. The Supreme Court denied the challenge, and explained that pursuant to the Administrative Procedure Act, federal courts could not engage in judicial review of the agency decision without an actual denial by the agency. *Id.* at 76–77. And in *Bean*, ATF did not deny the application—they merely returned it to *Bean* because of a lack of funding for § 925(c).

The Government indicated at oral argument that *Bean* has resolved the § 925(c) issue. The Government is wrong. *Bean* was a pre-*Heller* decision that analyzed when judicial review of an agency decision was appropriate under the Administrative Procedure Act. This case is post-*Heller*, and instead centers on an as-applied constitutional challenge to § 922(g)(1). Hatfield has not asked for a review of any agency decision, but rather asks the Court to declare that § 922(g)(1) is unconstitutional as-applied to him—the only thing he can do at this point, short of a presidential pardon. And Hatfield is correct: the Government has not demonstrated (1) an extremely strong public-interest justification for banning non-violent felons who received no prison time from possessing firearms for self-defense purposes, and (2) a close fit between that purpose and § 922(g)(1).

## CONCLUSION

In the end, the Government's position in this case was peculiar. In the early 1990s, they recommended to the sentencing court that Larry Hatfield should receive zero months in prison for his crime: making a false statement to the Railroad Retirement Board, a statutory felony arising over 150 years after the Founders penned the Second Amendment. Hatfield has maintained a spotless record since his felony conviction. But now, the Government argues that Mr. Hatfield—and nonviolent felons in similar shoes—are so dangerous to society that they simply should not be able to enjoy their constitutional right to keep a gun in their homes for self-defense. Those two positions are irreconcilable. And not only that, the Government insists that this is not a matter for the federal courts to touch, but rather should be left to the other branches of government via a mechanism like 18 U.S.C. § 925(c)—which Congress does not even fund anymore. But while reasonable minds throughout the Government and the people may disagree on gun rights as a policy matter, they cannot ignore the Second Amendment in the process.

So for the foregoing reasons, the Court **DENIES** the motion for summary judgment by Jefferson B. Sessions, III, in his Official Capacity as the Attorney General of the United States (Doc. 41), **GRANTS** Larry Edward Hatfield's motion for summary judgment (*See* Docs. 47, 48); and **DECLARES** that 18 U.S.C. § 922(g)(1) is an unconstitutional violation of the Second Amendment as-applied to Larry Edward Hatfield: a non-violent felon who received no prison time for his offense.

**IT IS SO ORDERED.**

**DATED: APRIL 26, 2018**

<u>s/ *J. Phil Gilbert*</u>
**J. PHIL GILBERT**
**DISTRICT JUDGE**